608 S.E.2d 879

Raymond Capers DIXON, Robert Marshall
Dixon and Kirsten Dixon, Appellants,

v.

Clinton Karl FORD, Jimmy F. Hughes, Jr.,
d/b/a J & D Pest Control, Defendants,

Of whom Clinton Karl Ford is the Respondent.

No. 3934.

Court of Appeals of South Carolina.

Heard Jan. 11, 2005.

Decided Jan. 31, 2005.

616

Kenneth R. Young, Jr. and Edgar R. Donald, Jr., both of Sumter, for Appellants.

M.M. Weinberg, Jr., of Sumter, for Respondent.

ANDERSON, J.:

Raymond Capers Dixon, Robert Marshall Dixon, and Kirsten Dixon (the Dixons) purchased a house from Clinton Ford. After the sale, the Dixons discovered substantial termite damage to the house. The Dixons initiated this action, and a verdict was rendered for Ford. We reverse and remand for a new trial.

## *FACTUAL/PROCEDURAL BACKGROUND*

Ford acquired a house at 9 Loring Mill Road as investment property, which he eventually decided to renovate and sell. A pest control company inspected the home prior to the renovations and provided an undated CL–100 report in July 1999. South Carolina Code of Laws regulation 27–1085(k) requires a current CL–100, one completed within the last thirty days, at any real estate closing.

In March 2000, the Dixons purchased 9 Loring Mill Road from Ford. Ford furnished the July 1999 CL–100 report at the closing. Importantly, the original CL–100 report identified the existence of termite damage and stated: "this damaged area has will been [sic] repaired by another contractor." The word "will" is written in small font above and between the words "has" and "been." The CL–100 provided at closing is identical except that the word "will" is scratched over so that the report reads: "this damaged area has been repaired."

The real estate contract contained the following "as ·is" clause:

19. CONDITION OF PROPERTY: (A) ... Buyer acknowledges the Seller, except as provided in subparagraphs (B)-(G) of this section, gives no guarantee or warranty of any kind, expressed or implied, as to the physical condition of the property or to the conditions of or existence of improvements, services, appliances or system thereto, or as to merchantability or fitness for a particular purpose as to the property or improvements thereof, and any implied warranty is hereby disclaimed by the Seller.... (D) Seller shall, at their expense, have the property inspected and shall obtain a Wood Infestation Report (CL100) from a licensed and bonded pest control operator that the residential dwelling and attached garage is free and clear from termites, fungus, excess moisture in the crawl space, wet or dry rot, and other wood destroying organisms.... If any infestation or structural damage is found, Seller agrees to have it corrected, at Seller's expense.

After purchase, the Dixons discovered substantial uncorrected termite damage. Robert Dixon testified that he and his brother first came upon the dilapidation while preparing to install a new heat pump:

I started to remove some of the lapboard that was right there by the electrical panel box and that's when the electrical panel box fell down and just was dangling there by the wires and that's when I called my brother over there and said, "David, I think we've got a real problem here." And we pulled off more of the boards and sure enough as I suspected the electrical panel box was supposed to been ... of course it was supposed to been put into the studs and

secured that way. The studs were completely termite riddled. As we tore off more we realized that more of it was done. We got to the corner of the house on the back porch and then we realized that the whole corner of the two ... the two by fours there was holding up the corner had completely been eaten away with termites and my brother and I looked at each other and said what are we going to do now because it looks like the roof is going to fall in.

The Dixons found similar damage to the floors and other areas of the house and responded by filing a suit against Ford and the pest control company that issued the CL–100. Summary judgment was granted to the pest control company, leaving Ford as the sole defendant, and fraud as the only remaining cause of action. The case went to trial, and the jury found in favor of Ford. The Dixons filed post-trial motions for judgment non obstante veredicto and alternatively for a new trial. These motions were based on the grounds that the court (1) gave an erroneous jury charge, and (2) allowed irrelevant and prejudicial testimony into evidence. Both motions were denied, and the Dixons appeal.

## *LAW/ANALYSIS*

### I.  The Contested Jury Charge

The Dixons argue the court improperly charged the jury that they had no right to rely on the wood infestation report supplied at closing. We agree.

### A.  Efficacy of the Charge

After explaining the elements of fraud, the court charged the jury:

A fraudulent act is characterized by dishonesty in fact, unfair dealing or unlawful appropriation of another's property by design. One cannot rely upon a misstatement of facts if the truth is easily within the reach of another. **I would also tell you that a purchaser of a home ... an infested home has no right to rely on favorable answers on the wood infestation report given the purchaser at the closing where the purchaser elected to close or failed to**

**comply with a recommendation on the report that he
investigate for structural damages.**

(Emphasis added).

■ "When instructing the jury, the trial judge is required to charge only the current and correct law of South Carolina." *Cohens v. Atkins,* 333 S.C. 345, 349, 509 S.E.2d 286, 289 (Ct.App.1999); *see also Brown v. Smalls,* 325 S.C. 547, 554–555, 481 S.E.2d 444, 448 (Ct.App.1997) ("Ordinarily, a trial judge has a duty to give a requested instruction that correctly states the law applicable to the issues and evidence."). However, when reviewing a jury charge for alleged error, the appellate court must consider the charge as a whole in light of the evidence and issues presented at trial. *Daves v. Cleary,* 355 S.C. 216, 224, 584 S.E.2d 423, 427 (Ct.App.2003). If the charge is reasonably free from error, isolated portions which might be misleading do not constitute reversible error. *Id.* "To warrant reversal for refusal to give a requested instruction, the refusal must have not only been erroneous, but prejudicial as well." *Cohens,* 333 S.C. at 349, 509 S.E.2d at 289; *see also Daves* at 224, 584 S.E.2d at 427 (stating a circuit court's refusal to give a properly requested charge is reversible error only where the requesting party can demonstrate prejudice from the refusal).

The language charged by the court came from *Nine v. Henderson,* 313 S.C. 309, 312–13, 437 S.E.2d 182, 184 (Ct.App. 1993). Specifically, the verbiage emanates from a parenthetical explanation of *Bostick v. Orkin Exterminating Co., Inc.,* 806 F.2d 504 (4th Cir.1986). The trial court, in the case *sub judice,* defended the controverted charge, explaining:

The quote is directly from the case of *Nine v. Henderson,* ... with the exception that that dealt with powder post beetles which I thought was a comment on the facts and I took that comment about powder post beetles out of it and I also took that part out of that particular language that said a South Carolina regulation because there's no testimony in the record regarding the South Carolina regulation. But other than that that is a direct quote from that case....

The *Nine* court's citation to *Bostick,* and the sentence it supports, reads in full:

We also agree, however, with the trial court that Nine, *under the circumstances here,* had no reasonable right to rely on Henderson's representations regarding the extent of termite damage to the building in question. *See Bostick v. Orkin Exterminating Co., Inc.,* 806 F.2d 504, 508–09 (4th Cir.1986) (construing South Carolina law and holding a purchaser of a home infested by powder post beetles had no right to rely on favorable answers on a wood infestation report given the purchaser at the closing where the purchaser elected to close and failed to comply with a recommendation in the report and a South Carolina regulation that he investigate for structural damage).

*Nine,* 313 S.C. at 312–13, 437 S.E.2d at 184 (emphasis added).

A close reading of both *Nine* and *Bostick* reveals that the charge given in the instant case is a misstatement of the applicable law and should not have been charged. In *Nine,* the dispositive question on appeal related to whether Nine, the buyer of a house, had a right to rely on the seller's representation regarding termite infestation on the property he was purchasing. 313 S.C. at 310, 437 S.E.2d at 183. Nine "knew from the very start the property had termite problems." *Id.* at 313, 437 S.E.2d at 184. For example, during negotiations, the seller "disclosed to Nine that a termite inspection done the previous May revealed the presence of termites in the eaves of the house and in the window sills and doors of the garage." *Id.* at 311, 437 S.E.2d at 183. Prior to closing, Nine rented and occupied the house, and he "personally repaired the termite-damaged eaves on the side of the house and repaired some additional damage that he discovered along the front of the house." *Id.*

The *Nine* court explicated:

At the closing, which Nine attended accompanied by his attorney, Henderson furnished Nine with three wood infestation reports. These reports were made the day after the parties signed the contract of sale by the same termite inspector who made the May inspection. They separately detailed inspections that the termite inspector made of the three improvements located on the subject property. They also set forth the inspector's conclusions regarding the

presence of termites and other wood-destroying insects in each of the buildings:

The report relating to the house expressly noted there had been a previous infestation of termites and there was evidence of prior termite treatment. . . . The report cautioned "[t]here is possible hidden old termite damage to the inside walls." A graph attached to the report concerning the house advised of "subterranean termites," "probable hidden damage," and "possible hidden termite damage in walls."

The report relating to the cottage also cautioned "[t]here is possible hidden termite damage behind the kitchen cabinets from previous infestation and along [the] baseboard by window." A graph attached to this report advised of "subterranean termites," "probable hidden damage," and "probable hidden old termite damage behind [the] kitchen cabinets and baseboard."

All three reports counseled Nine:

If there is evidence of active or past infestation of termites . . ., it must be assumed that there is some damage to the building caused by this infestation.

. . . .

. . . [Y]ou may wish to call a qualified . . . expert in the building trade to ascertain their [sic] opinion as to whether there is structural damage to this property.

*Id.* at 309, 437 S.E.2d at 183–84 (alterations in original).

Based on these facts, the court concluded: "By choosing not to postpone the closing and electing instead to proceed with it, [buyer] ignored, if not outright rejected, advice to have a qualified person ascertain whether the improvements on the property had sustained structural damage. . . ." *Nine* at 313, 437 S.E.2d at 184.

In *Bostick,* an extermination company prepared a wood infestation report stating there were "visible damaged structural members" caused by a beetle infestation, but that there was "no visible structural damage." *Bostick,* 806 F.2d at 505. Subsequently, the home purchaser discovered extensive structural damage and filed suit against the extermination company. Yet, disclaimers on the report stated structure that was not visible or accessible was not inspected. *Id.* at 506. Addi-

tionally, the court observed South Carolina regulations governing wood infestation reports provide that a report "cannot be viewed as a structural damage report." *Id.* at 507 (quoting S.C.Code Ann. Reg. § 27–1085(k)). The regulation reads, "If visual evidence of wood-destroying organisms or damage is noted in this report, further investigation for structural damage by qualified building experts is recommended." *Id.* The court found that Bostick's case was built upon the cornerstone that he had relied on the report as a record of structural damage. *Id.* at 508–09. This was impermissible under the regulations, and, therefore, his fraud action failed. *Id.*

The charge, "[A purchaser of] an infested home has no right to rely on favorable answers on the wood infestation report given the purchaser at the closing where the purchaser elected to close," is an inaccurate statement of South Carolina law. *Nine* held that under the circumstances presented in that case the buyer had no right to rely and cited *Bostick*—another case in which the particular facts nullified the right to rely—as support. However, our courts have not pronounced a per se rule holding, as a matter of law, that the purchaser of an infested home may not rely on a CL–100 report given at closing. To the contrary, as the *Nine* opinion recites, "[T]he question of whether reliance is justified in a given situation requires an evaluation of the circumstances involved, including the positions and relations of the parties." 313 S.C. at 312, 437 S.E.2d at 184 (citing *Elders v. Parker,* 286 S.C. 228, 332 S.E.2d 563 (Ct.App.1985)). The charge given by the trial court took from the jury its responsibility to evaluate the Dixons' actions and to determine whether they were justified in relying on the CL–100.

Further, *Nine* and *Bostick* are factually inapposite to the Dixons' case. Nine received wood infestation reports showing damage and elected to go forward with the claims. Bostick sought to sue the exterminator for fraud, but he relied on the report in a manner the court ruled was impermissible because of disclaimers and state regulations. The Dixons, in contrast, were given a clear CL–100, which may have been tampered with. Charging the *Nine* language instructed that the Dixons could not have relied on the report if it suggested an investigation for structural damage and the purchaser did not comply. The issue in this case was not that the Dixons knew of damage

and did not diligently investigate its extent; instead, the Dixons were informed that the damaged areas had been repaired. Ford and the Dixons contractually agreed that Ford would (1) be responsible for procuring an independent third party to certify that the house is free from termite infestation and damage, and (2) correct any infestation or damage at his own expense. Whether the Dixons were justified in their reliance under the facts of this case is a question for the jury, and it was error for the court to give the charge.

## B. Impact of the "As Is" Clause

*MacFarlane v. Manly*, 274 S.C. 392, 264 S.E.2d 838 (1980), establishes that an "as is" clause does not preclude a suit for fraud. *MacFarlane* involved an action for fraud in the sale of a house that suffered from termite and water damage. The contract included an "as is" clause. The trial court granted summary judgment to sellers on the basis that the sellers "as a matter of law had no duty to disclose any matter to the Plaintiffs." *Id.* at 392, 264 S.E.2d at 839. Reversing, our supreme court announced:

The "as is" clause of the contract does not constitute an absolute defense to an action for fraud and deceit. The inclusion of "as is" clauses is usually an effort on the part of the seller to assure application of the caveat emptor rule....

In years gone by, the tendency of the law was to let the buyer beware in real estate transactions. The more recent trend at the law is to hold the seller to a more strict accountability.

*Id.* at 395–96, 264 S.E.2d at 840.

Furthermore, the "as is" clause in this case provided that no guarantee or warranty was given **"except as provided in subparagraphs (B)-(G)[.]"** In subparagraph (D), Ford agreed to procure a clean CL–100 and to correct any infestation or damage at his expense. Consequently, the "as is" clause does not protect Ford from the Dixons' claim of fraud.

## C. Prejudice Resulting from the Erroneous Charge

Notwithstanding the impropriety of the charge, to warrant reversal, the charge must have prejudiced the Dixons. *See*

*Cohens v. Atkins,* 333 S.C. 345, 349, 509 S.E.2d 286, 289 (Ct.App.1999). We find that the charge given substantially prejudiced the Dixons' case.

In order to prevail on their claim for fraud, the Dixons had to prove all nine of the elements of fraud in South Carolina. *See Redwend Ltd. P'ship v. Edwards,* 354 S.C. 459, 473, 581 S.E.2d 496, 503–04 (Ct.App.2003) *cert. denied* ("The elements of an action for fraud based on a representation include: (1) a representation; (2) falsity; (3) its materiality; (4) knowledge of the falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury."). By giving the erroneous charge, the court effectively determined that the Dixons had no right to rely as a matter of law; therefore, they were precluded from proving one of the essential elements of fraud. The erroneous charge here is the quintessential prejudicial charge because it established, as a legal conclusion, that the Dixons could not prevail on an element of their cause of action. Pellucidly, the charge prejudiced the Dixons, and the case must be remanded for retrial.

### D. Preservation of the Objection to the Charge

■ Ford seeks to circumvent the erroneous charge by arguing the issue was not preserved because the objection was not on the grounds that the charge did not match the facts. However, after the charge, the Dixons' counsel did object to the offending language:

**The Court:** Additions or exceptions to the charges, Mr. Young?

**Mr. Young:** Yes, sir. .... You gave a charge that in effect commented on the termite letter and whether or not if a buyer proceeded with an infected house or that they did so at their own peril just about and that's the essence of what you're saying and they had to follow the directions on the letter to get a structural engineer to that effect, the letter that was in this particular case was in fact a clear letter because the letter was presented at closing showed that the work had been completed by another contractor

therefore any damage that was found would have been corrected as what Mr. Stoddard said that it was a clear letter, my clients thought it was a clear letter, that's the reason they proceeded with closing. . . .

When the court defended the language as originating from *Nine,* counsel argued that in *Nine,* the purchaser "made an informed decision knowing that the wood infestation report showed [infestation]. They still went through with the closing. That's not what we have here." The court referred to language from the report in this case, noting the report did not consider structural damage. Counsel rejoined, "But it was repaired. That's under repairs." This colloquy reveals that the Dixons' counsel did raise the salient issue: the language from *Nine* does not fit the facts and issues raised in this case. Accordingly, the issue was raised to the trial court and preserved for our review.

Ford contends that the subject matter of an objection regarding a jury instruction is not preserved where an objection is made prior to the charge and not renewed after the charge is given but prior to the jury's retiring to deliberate. To support this proposition, he refers the court to *Creighton v. Coligny Plaza Ltd.,* 334 S.C. 96, 119, 512 S.E.2d 510, 522 (Ct.App.1998). However, the Dixons did object after the jury was charged, but prior to the jury beginning its deliberations. Thus, this argument is inappropriate.

■ Nonetheless, we take this opportunity to remind the bar that Rule 51, SCRCP, does not require that the objection to a charge be renewed after the charge is given and prior to the jury's retiring to deliberate. Instead, it only requires an objection on the record, opportunity for discussion, and a specific ruling by the trial court on the jury charge issue. *Keaton ex rel. Foster v. Greenville Hospital System,* 334 S.C. 488, 494–95, 514 S.E.2d 570, 573–74 (1999), addresses whether an objection to a jury charge was properly preserved. In *Keaton,* the plaintiff did not object to the pertinent jury charge prior to the initial jury charge reading. The court charged the jury, but accidentally left out the charge at issue. The defendants then objected to the court's omission of the charge; the judge agreed that the charge should have been given. At this point, the plaintiff objected to the charge for

the first time. The court overruled the objection, brought the jury back into the courtroom, and read the charge. The *Keaton* court explained:

> [Plaintiff's] on the record explanation of his objection to the hindsight jury charge along with the trial judge's ruling on that issue is sufficient to preserve the objection for appeal. The objection is preserved despite [plaintiff] not objecting to the charge after it was read to the jury. Our recent decision of *State v. Johnson,* 333 S.C. 62, 64 n. 1, 508 S.E.2d 29, 30 n. 1 (1998), observed that the majority and dissenting opinions in *State v. Whipple,* 324 S.C. 43, 476 S.E.2d 683 (1996), were "being read to hold that where a party's jury charge objections or requests are denied on-the-record after a pre-charge conference, the party must renew those objections or requests subsequent to the courts instructions to the jury. The majority opinion in *Whipple,* however, did not establish such a rule." *Id. Johnson* clarified the confusion in *Whipple* by stating, "where a party requests a jury charge and, after opportunity for discussion, the trial judge declines the charge, it is unnecessary, to preserve the point on appeal, to renew the request at [the] conclusion of the court's instructions." *Id.* ... Like the petitioner in *Johnson,* [plaintiff] objected on the record and the trial judge specifically ruled on the objection.

334 S.C. at 494–95, 514 S.E.2d at 573.

## II. Testimony of William Brunson

The Dixons argue the testimony of William Brunson should not have been admitted because it was irrelevant and overly prejudicial. We decline to address this issue.

## *CONCLUSION*

For the reasons discussed above, the decision of the trial court is

**REVERSED AND REMANDED FOR A NEW TRIAL.**

STILWELL and SHORT, JJ., concur.